```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TENNESSEE
 2                       WESTERN DIVISION

 3    _____
                                    )
 4    UNITED STATES OF AMERICA,      )
                                     )
 5          Plaintiff,               )
                                     )
 6    VS.                            )  NO. 1:19-cr-10040-JTF-1
                                     )
 7    JEFFREY W. YOUNG, JR,          )
                                     )
 8          Defendant.               )
      _____
 9

10

11              TRANSCRIPT OF JURY TRIAL PROCEEDINGS

12                          BEFORE THE

13              HONORABLE JOHN T. FOWLKES, JR.

14                      March 28, 2023

15

16

17

18                      MORNING SESSION

19

20

21

22

23

24              LASHAWN MARSHALL, RPR
                OFFICIAL COURT REPORTER
25              167 N. MAIN STREET - SUITE 242
                MEMPHIS, TENNESSEE  38103
```

*UNREDACTED TRANSCRIPT*

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4                    MS. KATHERINE PAYERLE
                      MR. ANDREW PENNEBAKER
 5                    Assistant United States Attorneys
                      UNITED STATES DEPARTMENT OF JUSTICE
 6                    FRAUD SECTION
                      1400 New York Avenue, NW
 7                    Washington, DC  20530

 8

 9    FOR THE DEFENDANT:

10                    MR. CLAIBORNE H. FERGUSON
                      MR. RAMON DAMAS
11                    Attorneys at Law
                      CLAIBORNE FERGUSON LAW FIRM, P.A.
12                    294 Washington Avenue
                      Memphis, Tennessee  38103
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **W I T N E S S   I N D E X**

2

3    HEATHER GOSLEE

                                                    PAGE
4
          DIRECT BY MR. PENNEBAKER               9
5         CROSS BY MR. FERGUSON                  43
          DIRECT BY MR. PENNEBAKER               61
6         CROSS BY MR. FERGUSON                  68

7

8    KRISTIE GUTGSELL

                                                    PAGE
8

9         DIRECT BY MS. PAYERLE                  73
          CONTINUED DIRECT BY MS. PAYERLE        114

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                           KRISTIE GUTGSELL,

 2    having been first duly sworn, was examined and testified

 3    as follows:

 4                          DIRECT EXAMINATION

 5    BY MS. PAYERLE:

 6    Q.    Good morning, Ms. Gutgsell.

 7    A.    Good morning.

 8    Q.    Would you please just introduce yourself to the

 9    jury, your name and what city you live in.

10    A.    Kristie Gutgsell.  And I live in Henderson,

11    Tennessee.

12    Q.    And --

13          THE COURT:  Excuse me.  Could you spell that

14    last name?

15          THE WITNESS:  Sure.  It's G-U-T-G-S-E-L-L.

16          THE COURT:  Thank you.

17          MS. PAYERLE:  I understand that T is silent.

18    Sorry.

19          THE WITNESS:  That's right.

20    BY MS. PAYERLE:

21    Q.    Okay.  Now, Ms. Gutgsell, do you know the defendant

22    Jeffrey Young?

23    A.    I do.

24    Q.    Okay.  And could you identify him somewhere in the

25    courtroom today based on where he's sitting and something
```

 1    he's wearing?

 2    A.    He's sitting right there, and he has on glasses and

 3    a suit.

 4    Q.    Okay.

 5          **MS. PAYERLE:**  May the record reflect that the

 6    witness has identified the defendant in the courtroom?

 7          **THE COURT:**  The record will reflect the witness

 8    has pointed out and identified the defendant.

 9    **BY MS. PAYERLE:**

10    Q.    How do you know Mr. Young?

11    A.    I worked for him as his office manager.

12    Q.    And where was that?

13    A.    In Jackson, Tennessee.

14    Q.    Is that Madison County?

15    A.    Yes, ma'am.

16    Q.    What -- what was Preventagenix?

17    A.    It was a medical clinic.

18    Q.    Okay.

19          **MS. PAYERLE:**  I'm going to show the witness a

20    series of photographs.  I believe it's 12 pages.  If I

21    may approach, Your Honor.

22          **THE COURT:**  Go ahead.

23          **MR. PENNEBAKER:**  That's been premarked

24    Government's 601.

25    **BY MS. PAYERLE:**

1    Q.    And ask you to page through them and see if these

2    are photographs of various locations at Preventagenix.

3              (A document was passed to the witness.)

4    **BY MS. PAYERLE:**

5    Q.    Okay.

6    A.    Yes, ma'am, that's the clinic.

7    Q.    Thank you very much.

8    A.    Yes, ma'am.

9              **MR. PENNEBAKER:**  Your Honor, I'd like to

10   introduce into evidence the 12 pages that are located at

11   Government's 601, marked Page 8 through 19.  Actually be

12   11 pages.  My math is wrong.

13             **THE COURT:  Eleven**, I'm assuming, pages with

14   photos of the clinic; is that correct?

15             **MS. PAYERLE:**  Yes, Your Honor.

16             **THE COURT:**  We'll go ahead and receive.  Be

17   collective Exhibit Number 7.

18             (The above-mentioned item was marked as

19   Exhibit No. 7.)

20   **BY MS. PAYERLE:**

21   Q.    And let's just take a look at the page that we

22   internally marked as 11 and publish to the jury.  Thank

23   you.

24         And what are we looking at here?  Is that the front

25   of Preventagenix?

1    A.    It is.  It's the outside of the front of the

2    clinic.

3    Q.    Okay.  We can take that down.

4          How long, Ms. Gutgsell, were you the office manager

5    there?

6    A.    I started in August of 2015, and I quit in January

7    of 2017.

8    Q.    And did you replace somebody as the office manager?

9    A.    I did.

10   Q.    Who was that?

11   A.    Heather Goslee.

12   Q.    As the office manager, what were your jobs?

13   Describe generally.

14   A.    I was in charge of paying different bills for the

15   clinic, making sure that the schedule -- excuse me.

16   Q.    That's okay.  Take your time.

17   A.    That the schedule was ready for the day, that the

18   employees were ready for the day, that Jeff was ready to

19   work for the day.

20   Q.    And I just saw you hesitate a moment.  Are you --

21   are you a little nervous?

22   A.    Just a little bit, yeah.

23   Q.    Why is that?

24   A.    It's -- this has been a very difficult time.

25   Q.    Okay.  You said you were in charge of the schedule

 1    for the day.

 2         At this time, I'd like to show you a document that

 3    the government has marked Exhibit 703.

 4         **MS. PAYERLE:**  I just need to find it in my stack

 5    here, Your Honor.  I apologize.

 6         I'm going to seek assistance of those more

 7    organized than I.

 8    **BY MS. PAYERLE:**

 9    Q.    Show you 703.  It's a five-page document.

10         Is this a schedule, an example of a schedule for

11    the day for patients that you just talked about?

12         (A document was passed to the witness.)

13    A.    Yes, ma'am.

14         **MS. PAYERLE:**  All right.  The government moves

15    to admit.

16         **THE COURT:**  We'll receive it.  Exhibit

17    Number 8.

18         (The above-mentioned item was marked as

19    Exhibit No. 8.)

20         **MS. PAYERLE:**  Be number -- is that 8?  Thank

21    you.

22    **BY MS. PAYERLE:**

23    Q.    All right.  Let's go ahead and publish Exhibit 8.

24         All right.  Just kind of describe to the jury what

25    we're looking at here as an example document.

1   A.    So this would be basically all the patients for the

2   day.  It would be their -- their appointment time, their

3   name, and then what their chart number was in the system,

4   their telephone number, who the provider was, which was

5   Jeff, what type of insurance they had.  And then in the

6   comments was typically what they were there for.

7   Q.    All right.  Let's go ahead and just blow up, so the

8   jury can see, maybe the top third of the page.

9         You see on the right there are several patients

10  where the description is one-month follow-up.  What were

11  those patients coming in to get?

12  A.    Most of those patients would be coming in to get a

13  controlled prescription.

14  Q.    Why -- why would it be labeled one-month follow-up?

15  A.    Because they came in monthly to get those

16  controlled prescriptions.

17  Q.    And every time they came in the door, did the

18  clinic bill for an office visit to their insurance?

19  A.    Yes, ma'am.

20  Q.    And if they didn't have insurance, how would the

21  clinic get paid?

22  A.    They would pay out of their own pocket.

23  Q.    And what was that?  Do you remember what that cost?

24  A.    There were different prices for whether it was an

25  established patient, a new patient, or if they had to

 1  take a drug screen or not.  It would be right around a

 2  150, $175, if I remember correctly, depending on a drug

 3  screen or if they were established or not.

 4  Q.    Okay.

 5        **MS. PAYERLE:**  And Ms. Silverberg, if we could

 6  just blow up, so they can see the rest of this page, the

 7  middle third and then the bottom third.

 8        This is all for one day.

 9        And then let's go to the next page and let the

10  jury take a look at that second page of that same day.

11        Okay.  Back out and take -- look at the bottom

12  half.

13  **BY MS. PAYERLE:**

14  Q.    Ms. Gutgsell, is this the typical number of

15  patients that Mr. Young would see on a day, this sort of

16  full- to two-page list?

17  A.    Yes, ma'am.

18  Q.    And about a typical kind of distribution of the

19  number of one-month follow-up patients versus other

20  issues?

21  A.    Correct.  Yes, ma'am.

22  Q.    All right.  Next up, I'd like to show you what's

23  been marked Exhibit 602.

24        **THE COURT:**  Before we get to that, what was the

25  date of this schedule?

1    **MS. PAYERLE:**  Thank you.

2           **THE COURT:**  Are you able to see?

3           **MS. PAYERLE:**  Oh, I'm sorry.  Let's go back to

4    Page 1, and blow up the very top there.

5           **THE WITNESS:**  The date of this is actually 1/11

6    of 2017.

7           **MS. PAYERLE:**  Okay.  That's January 11th.  Thank

8    you.

9           **THE COURT:**  Do you know the number of patients

10   that day?  If you don't know, that's fine.

11          **THE WITNESS:**  I don't know.  No, sir, I don't

12   know.

13          THE COURT:  That's fine.

14          **MS. PAYERLE:**  All right.  Ms. Silverberg, we can

15   put that down.

16   **BY MS. PAYERLE:**

17   Q.   And I'm going to show you exhibit -- what's been

18   marked as 602, and this is a one-page exhibit.  It's the

19   floor plan with some edits you'll tell the jury about at

20   Preventagenix?

21   A.    Correct.

22          **MS. PAYERLE:**  Move to admit, Your Honor.

23          **THE COURT:**  We'll go ahead and receive it, floor

24   plan of the clinic.

25             (The above-mentioned item was marked as

1   Exhibit No. 9.)

2              THE COURT:  That'll be Number 9.

3              **MS. PAYERLE:**  And would you publish,

4   Ms. Silverberg, Exhibit 602.

5   **BY MS. PAYERLE:**

6   Q.    All right.  So you've just seen a list, or you've

7   just talked about a list of patients that were on the

8   schedule.  So focusing specifically on the list of

9   patients that were sort of officially scheduled at the

10  clinic, would you describe for the jury where they would

11  come into the clinic on this floor plan?

12  A.    Okay.  So typically where it says "main entrance,"

13  that was the front door.  And then they would walk in and

14  go to the right, which is Suite B.  And then there's an

15  area right there where it says "patient seating."  That's

16  where patients would come in and seat.  And then the

17  desk, that's where they would check in with the

18  receptionist.

19  Q.    Okay.  And then if they were called back to be seen

20  by Mr. Young, where would they go?

21  A.    Okay.  So if you see to the right of where it says

22  "office staff desk," there's a door.  Yes, ma'am, right

23  there.

24  Q.    I circled it.  There we go.  Okay.

25  A.    So they would go through that door, and that would

```
 1   take you to the back part where the patient rooms, the

 2   lab, the triage area and all that is.

 3   Q.    Okay.  The patient rooms.

 4         Okay.  And could you describe for the jury sort of

 5   what the waiting room looked like in terms of the

 6   patients who were there during the time that you worked

 7   at Preventagenix?

 8   A.    Like as far as what the patients looked like?

 9   Q.    Yes.  And was it empty or full, that kind of thing.

10   A.    It was always full.

11         The -- the patients, a lot of them looked as if

12   they had issues.

13   Q.    Okay.  And, of course, you're under oath, and so

14   now is not the time to be polite.  If you could just

15   describe to the jury more specifically what you observed

16   with Mr. Young's patients.

17   A.    As if they were strung out.

18   Q.    Okay.  Now, where was -- where was your office on

19   this map?

20   A.    Okay.  So if you look back at the main entrance,

21   that area right there is kind of like a common area as

22   you walk in the front door.  And if you go to the left,

23   that would be the business side.  And my office -- you go

24   through that door, and my office was -- Jeff's office was

25   in the very end.
```

1   Q.    Here?

2   A.    No, other -- the other end.

3   Q.    All right.  Over here somewhere?

4   A.    Down by where it says "door," all the way at the

5   end of the corner.

6   Q.    So over here?

7   A.    Yes.  And then mine would be right in front of his.

8   Q.    Right here?

9   A.    No.

10  Q.    No?

11  A.    On top, I guess I should say.  Sorry.

12  Q.    Okay.

13  A.    And then the files would be farther down, like in

14  the third room.

15  Q.    Okay.  Now, you talked about this sort of -- the

16  process for the patients that we saw on that list.  Did

17  everybody who was getting prescriptions from Jeffrey

18  Young go -- go through the waiting room and wait to get

19  called back?

20  A.    No, ma'am.

21  Q.    Explain briefly what you mean by that.

22  A.    Jeff had a lot of friends and a lot of people that

23  would come in through -- if you see in the back where it

24  says "lab," there's -- there is a back door beside the

25  lab that's not on this piece of paper.

1    Q.    And actually while you're talking about that, can

2    we please publish for the jury Exhibit -- I believe

3    it's 7 and our internal page marking 16.

4          Maybe a different page.  That will be Page 9 of

5    Exhibit 7.  And what are we looking at here?

6    A.    That is the actual back door of the clinic.

7    Q.    Okay.  And so let's go back to the floor plan at

8    Exhibit 9.

9          So you said some patients came in through that back

10   door.  Were there other ways that people who were getting

11   prescriptions came into the clinic to see Mr. Young?

12   A.    Sure.  Some would come in the main entrance and go

13   to the left, like where my office is and his office was.

14   Some would still walk into the main patient area, and

15   they were recognized by the -- the receptionist, and they

16   would get up, because that door that is right there in

17   the regular patient seating was always locked.  Yes,

18   correct.  And the receptionist would recognize them as

19   being one of Jeff's friends.  And they would just,

20   without questions asked, get up and go and lock the door,

21   and they would just walk back there.

22   Q.    Okay.  So these -- these people who bypassed the

23   normal patient procedure, I know you've described they'd

24   come into the office through various ways.  But just for

25   simplicity, can we sort of call them back-door patients?

```
 1    A.    Sure.  Sure.

 2    Q.    Okay.  And can you also describe -- was there a

 3    category of patients called VIPs at the clinic?

 4    A.    Yes.

 5    Q.    Okay.

 6    A.    That's different.

 7    Q.    They're different.  Okay.

 8    A.    Yes.

 9    Q.    Can you explain to the jury who VIPs were?

10    A.    Jeff had a system set up that if you paid, I

11    believe it was a thousand dollars, that was for a year of

12    what he called like a concierge service to where they

13    would get private access to him, whether it'd be Facebook

14    Messenger, telephone calls, not having to wait in the

15    waiting room.  They would always get to get called back

16    first.  Those were the VIP patients.

17    Q.    And did that -- did that program really take off,

18    that thousand dollars a year to get special access to

19    Jeffrey Young?

20    A.    When I was there, no, it didn't.  I didn't know

21    many patients that were a part of that.

22    Q.    But you did have people with special access, these

23    back-door patients who weren't paying special premiums?

24    A.    Correct.  Those are two different types of

25    patients.
```

 1   Q.    All right.  Can you name the names of these --
 2   let's call them back-door patients that would come in to
 3   see Mr. Young?
 4   A.    Sure.  Like Ben Elston, Daphne Joyner, Alexandria
 5   Gray.
 6   Q.    Were there any people that have fame or sort of
 7   notoriety in some way?
 8   A.    Oh, yes.  He was -- he was friends with a lot of
 9   musicians, rock stars, popular groups.
10   Q.    About how many times a week did you see back-door
11   patients come in to see Mr. Young and bypass these normal
12   doctor's office procedures?
13   A.    Well, it happened on a daily basis, so it was
14   several times a day.  So if I had to classify, like, for
15   a week, I would say at least 10 times, 10 people a week.
16   Q.    And over the time that you were there, can you
17   estimate the number of these sort of back-door patients,
18   the total number of people that came in, in alternate
19   ways through the clinic?
20   A.    Oh, well, considering I worked there for a little
21   over a year, I would have to say it was well over a
22   hundred different people.
23   Q.    All right.  Let's talk a little bit about these
24   people.  Can you put them in sort of a categories?  Was
25   there anything that they had in common?

1    A.    I mean, I guess some of the people did have

2    different things in common.

3    Q.    Okay.  Let's -- first of all, were they men and

4    women?

5    A.    They were both.  Yes, men and women.

6    Q.    Okay.  So who were the men?  Like, what did they

7    have in common?

8    A.    Most of the men were musicians, buddies that Jeff

9    had that, you know, he either grew up with or played

10   music with.

11   Q.    Okay.  And did the women have anything in common?

12   A.    Most of them were pretty women who were either

13   sleeping with Jeff or attracted to Jeff or Jeff was

14   attracted to.

15   Q.    And let's start with the women, if we could.

16   Can -- can you sort of estimate the quantity of women who

17   were part of this back-door group of a hundred that

18   you're talking about?

19   A.    Probably more than half were women.

20   Q.    And how did you know that he was sleeping with them

21   or trying to sleep with them or vice versa?

22   A.    He bragged about it, and you could also hear it.

23   Q.    What do you mean by "hear it"?

24   A.    He would have sex with them during the working day

25   in his office.

```
 1   Q.    And where were you that you could hear?

 2   A.    In my office.

 3   Q.    So right next door?

 4   A.    Correct.

 5   Q.    What specifically, if you could tell the jury,

 6   would he say when he was bragging about it?

 7   A.    There was tap-that-ass Tuesday, tap-that-ass

 8   Thursday.  There was -- he was going to have a nooner,

 9   which was during lunch hour.

10         He would, after he was done, put his fingers in my

11   face for me to smell.

12   Q.    And pardon me, but for the -- for jurors who might

13   not know, when you say "tap that ass," what is -- is that

14   slang?

15   A.    For he's going to have sex with these people.

16   Q.    Can you name some of these women that were in this

17   sort of back-door category who you knew he was sleeping

18   with?

19   A.    Sure.  Courtney Howell, Anastasia Brown, Daphne

20   Joyner.

21   Q.    Sorry.  Was it Anastasia Brown?

22   A.    Uh-huh.

23   Q.    Okay.  And Daphne Joyner.  Do you know if she

24   worked at the clinic?

25   A.    She did.
```

1  Q.    Okay.  Was she also known as Daphne Montoya?

2  A.    She was, yes, ma'am.

3  Q.    Okay.  Now, you mentioned the name Courtney Howell.

4  Did you witness an incident regarding Courtney Howell?

5  A.    I did.

6  Q.    Could you tell the jury about that, please?

7  A.    She was a patient as well as a person that Jeff had

8  sex with on a -- many occasions.

9        One time she came in on the business side and went

10 back to his office, which was right next to mine, and he

11 came back there.  They talked.  She had a drink.  And

12 then later, once he was done with patients, he came in,

13 shut the door, had sex with her, because I could hear it,

14 and then left to go see patients again.  And when I left

15 my office, I looked over, and she was asleep on his

16 couch.

17 Q.    Did you see what condition she was in?  When she

18 first came in the office, how did she look?

19 A.    She was fine.

20 Q.    And did you ever see her sometime between the time

21 that she was fine and the time that she was asleep?

22 A.    Yes.

23 Q.    And what was that sort of intermediate period like?

24 A.    Like she was having a hard time holding her head

25 up.  Thought she was sleepy.  You know, something was

1    going on with her.

2    Q.    Was Mr. Young prescribing controlled substances to

3    Courtney Howell?

4    A.    Yes, ma'am.

5    Q.    And how do you know that?

6    A.    There's a thing called PMP that you can pull to

7    see.  It was something that the receptionist would do on

8    a daily basis before the patients come in to see their

9    different controlled prescriptions.  And then Jeff would,

10   most of the time, chart it and -- in their charts.

11   Q.    Okay.  And just because we haven't heard the term

12   yet, can you just describe for the jury what the PMP is?

13   A.    Yes.

14   Q.    By the way, is it also called a CSMD?

15   A.    Yes.

16   Q.    Okay.  Same document?

17   A.    Same thing.

18   Q.    Okay.

19   A.    It's the same thing.  Basically it's a database

20   that physicians have access to, and it's supposed to help

21   you see -- if they're getting a controlled substance from

22   any doctor, it will show that.  And -- and you're

23   supposed to check to make sure people aren't doctor

24   shopping or getting overprescribed or getting, you know,

25   different medications on a monthly basis.  It was -- it

```
 1    was something that we did, that the receptionist did on a

 2    daily basis.  They would pull that and put it on the

 3    front of the chart.

 4    Q.    And so through looking at the PMP, you could see

 5    the prescriptions that Mr. Young was writing to various

 6    people?

 7    A.    Correct.

 8    Q.    Okay.  I guess, do you have anything to share about

 9    other women that fall into this category of back-door

10    patients?

11    A.    Most all of those women were receiving controlled

12    substances as well.

13    Q.    Okay.  You also mentioned -- let's talk more about

14    the men who were coming in the back door.

15          Can you name a few of -- I think you mentioned a

16    gentleman named Ben Elston?

17    A.    I did, yes, ma'am.

18    Q.    Did you know somebody named Jay Green?

19    A.    Yes, ma'am, I do.

20    Q.    Did he fall into that category?

21    A.    He did.

22    Q.    What did Jay Green do for a living?

23    A.    I believe he was a police officer for another

24    county, not Madison County.  I don't remember which one.

25    Q.    And did Mr. Young ever ask any favors of Jay Green?
```

1    A.    He did.

2    Q.    And explain what kind of things he would ask Jay

3    Green to do for him.

4    A.    He -- besides being his bodyguard, he went out with

5    Jeff a lot and acted as his bodyguard.  But he -- since

6    he was a police officer, he was able to look up different

7    things.  You know, if Jeff had a warrant or anybody filed

8    anything against him, Jay was able to look up in whatever

9    database to see if anything like that had happened.

10   Q.    And did Mr. Young prescribe controlled substances

11   to Jay Green?

12   A.    I do not know.

13   Q.    Okay.  Was there another police officer named

14   Bryant whom he -- with whom he was friends?

15   A.    Brian Spencer?

16   Q.    Is he a police officer?

17   A.    Yes, ma'am.

18   Q.    Okay.  Were they -- was he friends with Mr. Young?

19   A.    Yes.

20   Q.    All right.  And was -- was Brian or somebody Brian

21   was related to getting prescriptions from Mr. Young?

22   A.    His wife Lydia.

23   Q.    And did Mr. Young ever ask Brian to look up

24   information?

25   A.    Yes.

1    Q.    Okay.  What kind of information?

2    A.    The same thing, to see if -- if warrants were filed

3    or if his -- if Jeff's ex-wife had filed any kind of, you

4    know, harassment against him.  She threatened that often

5    with him, and so he wanted to know if she did, in fact,

6    follow through with what she said.

7    Q.    And then you also mentioned that -- that Jay Green

8    would serve as a bodyguard.  Did he have anybody else who

9    he would call his bodyguard?

10   A.    Ben Elston as well.

11   Q.    Okay.  And did he tell you -- did he tell you why

12   he needed a bodyguard?

13   A.    Jeff, as he would like to say, had a lot of haters,

14   and he thought that he needed protection from these men.

15   Q.    And did they -- did they bodyguard him at the

16   clinic or in other places?

17   A.    Like the clubs or any establishments that Jeff

18   would go to where it was more of a drinking atmosphere,

19   anything like that.

20   Q.    Did Jay Green and Ben Elston drink with him?

21   A.    Yes.

22   Q.    Okay.  And was he prescribing to Ben Elston as

23   well?

24   A.    Yes.

25   Q.    What about rock stars or people who were famous?

 1    Was there anybody like that in his orbit --

 2    A.    Yes.

 3    Q.    -- that came in through the back door?

 4    A.    Yes.

 5    Q.    Do you know any names?

 6    A.    Scott Bartlett.

 7    Q.    Do you remember why Scott Bartlett was famous?

 8    A.    He was in or is in a band.  And I don't know the

 9    name of it right now.  Maybe can tell you in a few

10    minutes.

11    Q.    Yeah, if you think of it, let us know.

12    A.    Sure.

13    Q.    And let's get back to Ben Elston, though, one of

14    his -- one of his bodyguards.

15          **MS. PAYERLE:**  At this time, Your Honor, the

16    government is going to show the witness -- checking on

17    the page count here.  It's a 364-page document.  We will

18    not discuss each page, I promise, which --

19    **BY MS. PAYERLE:**

20    Q.    Is this Ben Elston's patient file that was kept at

21    Preventagenix?

22          (A document was passed to the witness.)

23    A.    Yes, ma'am.

24          **MS. PAYERLE:**  Okay.  At this time, the

25    government moves to admit Ben Elston's patient file.

1              **THE COURT:**  Go ahead and receive it

2     collectively.  It will be Exhibit 10.

3              (The above-mentioned item was marked as

4     Exhibit No. 10.)

5              **MS. PAYERLE:**  And this is Exhibit 10.

6     **BY MS. PAYERLE:**

7     Q.    Let's take a look at Exhibit 10.

8           Publish just Page 199, if we could.

9           First, I'd like to just familiarize the jury with

10    this kind of document.  Are these -- is this kind of

11    document found throughout patient files at Preventagenix?

12    A.    Yes, ma'am.  These are toxicology reports.

13    Q.    All right.  And let's just zoom in to the top half

14    to sort of get oriented.

15          And the top half here, we have the patient's name.

16    And who's that?

17    A.    Ben Elston.

18    Q.    And the requesting physician, who's that?

19    A.    Jeff Young.

20    Q.    The patient's date of birth.  And on the right, the

21    date that the -- says "date collected"?

22    A.    Correct.  Okay.  His date of birth is 4/2 of '77,

23    and then the date collected is 11/17/2015.

24    Q.    What was collected?

25    A.    His urine.

1    Q.    Okay.  And then 11/20/2015, is that the date that

2    you received the report at Preventagenix?

3    A.    Correct.  That's when it came back to

4    Preventagenix.

5    Q.    All right.  Specimen type is urine.  And then under

6    "medications," there's three listed:  amphetamine,

7    carisoprodol, and hydrocodone.  Do you see that?

8    A.    Yes, ma'am.

9    Q.    And what did -- what did those indicate?

10   A.    That indicated the medications that Jeff prescribed

11   him.

12   Q.    Okay.  And then let's back out of that and look at

13   the bottom half, the summary of quantitative results

14   there.

15          Okay.  What are we looking at at here?

16   A.    Okay.  So on the first column, it says "drug name."

17   That is what drugs were in his system, in his urine.

18   Q.    Is that sort of the drugs they were testing for?

19   A.    No.  That was everything that was in his system.

20   Q.    Okay.  But then under --

21   A.    Oh, yes.  I see what you're saying.  Everything

22   that -- yes, I understand now.  I'm sorry.

23          Yes.  Everything that they tested for and then the

24   results show, you know, detected or not detected.

25   Q.    Okay.  So the ones that say "detected," to you that

1  meant it was in his system, and "not detected" means it

2  wasn't in his system?

3  A.    Correct.

4  Q.    And then under "outcome," there's "consistent" and

5  "inconsistent."  What does that mean?  The next column,

6  "outcome, consistent and inconsistent."

7  A.    Okay.  So basically it said that amphetamine was

8  detected in his system, and that's consistent with what

9  Jeff prescribed.

10  Q.    Okay.  And then let's look at an inconsistent, so

11  carisoprodol?

12  A.    Is not -- excuse me -- not detected, which makes

13  that inconsistent because Jeff does prescribe him that

14  drug, but it was not in his system, so therefore, it

15  makes it an inconsistent outcome.

16  Q.    All right.  And was there anything on this screen

17  that particularly concerned you?  And actually let me

18  back up because I want to lay some foundation for this.

19  Let me back up.

20        **MS. PAYERLE:**  Back out of that, if you wouldn't

21  mind.

22        No, I'm sorry.

23        **MS. SILVERBERG:**  Sorry.  Sorry.

24        **MS. PAYERLE:**  Yeah.  Okay.  You got it?  I give

25  terrible instructions.

1    BY MS. PAYERLE:

2    Q.    Whose handwriting is there at the bottom?

3    A.    That is my handwriting.

4    Q.    Okay.  And you said -- what did you write there at

5    the bottom?

6    A.    "Counseled patient and offered rehab.  Patient

7    stated he didn't have a problem."

8    Q.    Why did you counsel this patient?

9    A.    Because he failed his drug screen for other drugs

10   that Jeff did not prescribe to him.

11   Q.    Okay.  So let's go ahead and blow up the middle

12   piece again there.

13         And what's benzoylecgonine?  What did that mean to

14   you?

15   A.    I believe that to be cocaine.

16   Q.    And then what other drugs?  Like morphine,

17   nordiazepam, oxazepam, temazepam, what was the problem

18   with those?

19   A.    Those are also drugs that Jeff did not prescribe

20   him.

21   Q.    But they were detected in his system?

22   A.    Yes, ma'am.

23   Q.    And hydrocodone and hydromorphone?

24   A.    Hydrocodone was in his system, and Jeff prescribed

25   it.  And then the hydromorphone is a metabolite, I

 1    believe, of the hydrocodone.

 2    Q.    Okay.  So there's a lot of drugs in his system, and

 3    you counseled him.  You offered him to get rehab, and he

 4    said --

 5    A.    He didn't have a problem.

 6    Q.    Said he didn't have a problem.

 7          Why -- why were you counseling him?  I mean, in

 8    other words, was that part of your job sometimes?

 9    A.    It became part of my job, especially when it was

10    friends of Jeff's, to try to get rid of patients like

11    that, that he was continually writing controlled

12    prescriptions to, even though they were consistently

13    failing drug screens.

14    Q.    And did you believe Ben Elston fell into that

15    category?

16    A.    He did, yes, ma'am.

17    Q.    What happened after you tried to get rid of Ben

18    Elston?

19    A.    Jeff would just write him the prescription anyway

20    after office hours, at home, meet him in the parking lot,

21    whatever.  However he did it, he would still get the

22    prescriptions.

23    Q.    Did you talk to Mr. Young about this encounter you

24    had with Ben Elston?

25    A.    I don't remember this specific time, but there

1   was -- I don't know if it was this time or another time

2   that I spoke with Jeff about it, but it -- I have spoke

3   with Jeff about it many times.

4   Q.   And specifically you've talked to Jeff Young about

5   Ben Elston failing drug screens?

6   A.   Correct.

7   Q.   And what was Mr. Young's reaction?

8   A.   He wasn't surprised, and it was just a fleeting

9   thought for him.  He didn't really care one way or the

10  other.

11  Q.   Did it happen with some regularity that you or the

12  staff would try to dismiss patients for one reason or

13  another, and Mr. Young would continue prescribing to them

14  or allow them to return?

15  A.   Yes, often.  That happened often.

16  Q.   And can you think of some examples of that?

17  A.   Well, right here with Ben Elston.

18  Q.   Anybody else you can think of?

19  A.   Yes, ma'am.

20  Q.   All right.  Go ahead and name names.

21  A.   Tricia Stansell; Bethany Pusser.  I can't name just

22  right off the top of my head, but there are several.  If

23  I can look at a list, I can point them out to you.

24  Q.   Okay.

25  A.   I'm sorry.

1    Q.    That's okay.

2          Now, you testified that some of these kind of

3    back-door patients were locally famous or connected

4    people, like rock stars, musicians, things like that?

5    A.    Correct.

6    Q.    Can you tell the jury a little bit about

7    Mr. Young's attitude toward fame for himself?

8    A.    He craved fame.  He needed fame.  He believed that

9    he was famous.  He wanted to get fame any way that he

10   possibly could.  He wanted to be the center of attention.

11   He was the center of attention very often, whether it

12   hurt people or not.

13   Q.    I'm going to show you another exhibit, a one-page

14   exhibit marked -- and we can take this down.  Thank

15   you -- marked 603.

16          (A document was passed to the witness.)

17   **BY MS. PAYERLE:**

18   Q.    Do you recognize this as a -- an advertisement that

19   Mr. Young posted?

20   A.    I do.

21   Q.    Okay.

22          **MS. PAYERLE:**  Move to admit, Your Honor.

23          **THE COURT:**  We'll go ahead and receive it.  It's

24   a one-page document.  It will be Number 11.

25          (The above-mentioned item was marked as

 1  Exhibit No. 11.)

 2           **MS. PAYERLE:**  And let's publish 603 -- or

 3  sorry -- Number 11, please.  Exhibit 11.

 4  **BY MS. PAYERLE:**

 5  Q.    Ms. Gutgsell, where did you -- where did you see

 6  this advertisement posted?

 7  A.    Facebook.

 8  Q.    And it says "sail away with the Rock Doc."

 9        Whose photo is that in the picture?

10  A.    That's Jeff Young.

11  Q.    And who is the Rock Doc?

12  A.    That was also Jeff Young.

13  Q.    Okay.  Tell the jury about the Rock Doc.

14  A.    I'm not real sure how he got that name, but he --

15  he went by the "Rock Doc" every chance that he got, but

16  he's not a doctor.

17  Q.    And did he ever try to publicize that image in some

18  way or create some kind of media content?

19  A.    Daily.

20  Q.    Did there come a time when he became interested in

21  a reality TV show?

22  A.    Yes, ma'am.

23  Q.    Tell the jury about that.

24  A.    He hired a producer and a film guy to come in and

25  record his life, from the time he woke up until the time

```
 1   he went to bed, for a week, and wanted to start a -- like

 2   a reality show, and he called it "Rock Doc."

 3   Q.    And did, in fact, people create this show for him?

 4   A.    It was on YouTube.  So besides being anywhere and

 5   besides YouTube, I'm not sure of, but it was recorded and

 6   published on YouTube.

 7   Q.    And did you see a trailer for this show on YouTube?

 8   A.    I have.

 9        MS. PAYERLE:  And I -- the government has a -- I

10   believe has a clip on a CD labeled Document 608, so we

11   would move to enter that into evidence as well.

12        MR. FERGUSON:  I do have a question on this, if

13   we could sidebar.

14        MS. PAYERLE:  Yes.

15        (Bench conference on the record, with

16   Mr. Ferguson and Ms. Payerle only, out of the hearing of

17   the jury.)

18        MR. FERGUSON:  Is it the whole -- it's the whole

19   thing?

20        MS. PAYERLE:  Not the whole episode.  It's like

21   a three-minute trailer.

22        MR. FERGUSON:  I would --

23        MS. PAYERLE:  It's the -- it's like a trailer

24   for the show.

25        MR. FERGUSON:  I think the whole exhibit needs
```

1    to be shown and not just pieces and parts.

2         **MS. PAYERLE:**  Well, I mean, it is the whole --

3    it is -- it was -- it was a trailer that he published on

4    YouTube as a piece.

5         **MR. FERGUSON:**  Okay.

6         **MS. PAYERLE:**  So it's like the whole trailer.

7         **MR. FERGUSON:**  Okay.

8         **MS. PAYERLE:**  So he published a -- like a

9    25-minute episode, but then he published like a

10   three-minute preview of --

11        **MR. FERGUSON:**  We're going to play a 25-minute

12   episode?

13        **MS. PAYERLE:**  I wasn't going to, but I -- not

14   right now.  Her -- because she's just testified she

15   saw -- I mean, the trailer's three minutes, and it's a --

16   it's a piece --

17        **MR. FERGUSON:**  We'll come back to it.  I'm okay

18   right now.  I just want to make sure what I was about to

19   say because this --

20        **THE COURT:**  All right.  Let's get on with it.

21        **MS. PAYERLE:**  It's a complete trailer.

22        **THE COURT:**  Three minutes.

23        **MR. FERGUSON:**  I'm trying to make objections

24   around the jury.

25        **THE COURT:**  I appreciate it.  Thanks.

1              **MR. FERGUSON:**  Thank you.

2              **MS. PAYERLE:**  Thanks.

3              (Bench conference concludes, and the proceedings

4    continue as follows:)

5              MS. PAYERLE:  Okay.  Government moves to admit

6    the sort of three thirty -- it might be

7    three-minutes-and-30-second-or-so trailer for the Rock

8    Doc TV show.

9              **THE COURT:**  I'm assuming the witness has seen it

10   before because she hasn't identified anything.

11             **MS. PAYERLE:**  Right.  She has, Your Honor.  I

12   described it to her, and she said she'd seen it.

13                  THE COURT:  Go ahead.

14             **MS. PAYERLE:**  Okay.  Let's go ahead and play.

15   And I believe -- do we have this as a CD?

16             **MS. SILVERBERG:**  No, I have it right here.  Oh,

17   yeah, he -- the CD's there for him.

18             **MS. PAYERLE:**  All right.  Let's go ahead and

19   play.

20             (The above-mentioned item was marked as

21   Exhibit No. 12.)

22             (An audio-video recording was played.)

23   **BY MS. PAYERLE:**

24   Q.   Okay.  I'm going to stop it.  We will play the

25   whole thing.  I just want to stop at certain parts and

1    ask you questions.

2         Here he says the clinic had a heavy focus on

3    preventative medicine.

4         In reality, what percentage of patients would you

5    estimate were just there to get controlled substances

6    month after month?

7    A.    I would say well over half, 70 percent.

8    Q.    And what percentage of those patients actually paid

9    cash out of pocket for those appointments?

10   A.    25 to 30 percent.

11   Q.    Did -- taking the group of those cash-pay patients,

12   did cash-pay patients ever come in for sort of what's

13   called ordinary preventative medicine, or did the

14   cash-pay patients always just get controlled substances?

15   A.    So there were some that came in for various things

16   that were not controlled substances, not -- not very many

17   at all, though.

18   Q.    So I guess just to clarify, the majority of

19   cash-pay patients were there for controlled substances?

20   A.    Yes, ma'am.

21        **MS. PAYERLE:**  Okay.  Let's keep playing.

22        (An audio-video recording was played.)

23   **BY MS. PAYERLE:**

24   Q.    Okay.  Did Mr. Young talk about his image a lot?

25   A.    Yes.

```
1   Q.    The way he looked?

2   A.    Yes.

3   Q.    And tell the jury about that.

4   A.    He -- he liked the fact that he didn't look like a

5   typical provider with his tattoos and his, you know, hat

6   on backwards and didn't wear the typical white coat.  He

7   was, you know, someone just like the gentleman said, that

8   should be in the front line of a rock band.

9   Q.    Okay.  Let's keep going.

10        (An audio-video recording was played.)

11  BY MS. PAYERLE:

12  Q.    Did Mr. Young go on this local Jackson radio show a

13  lot?

14  A.    He did.  He had to pay to be on that.  It was for

15  advertising.

16  Q.    Okay.

17        MS. PAYERLE:  Let's keep going.

18        (An audio-video recording was played.)

19  BY MS. PAYERLE:

20  Q.    Who is -- who is this gentleman here?

21  A.    That's Scott Bartlett.

22  Q.    Okay.  He was the rock star you were talking about?

23  A.    Correct.

24  Q.    Okay.

25        MS. PAYERLE:  Let's keep going.
```

1          (An audio-video recording was played.)

2    **BY MS. PAYERLE:**

3    Q.    Where -- where were they sitting?

4    A.    That's in Jeff's office.

5    Q.    Okay.

6          **MS. PAYERLE:**  Let's keep going.

7          (An audio-video recording was played.)

8    **BY MS. PAYERLE:**

9    Q.    That gentleman we just saw talking earlier saying

10   there's a lot going on there, who is that?

11   A.    Kevin Phillips, Jeff's best friend that he refer to

12   as Uncle Kevin.

13   Q.    Okay.  Did he have another nickname besides Uncle

14   Kevin?

15   A.    Puffy K.

16         **MS. PAYERLE:**  And let's keep on going to the

17   end.  Thanks.

18         (An audio-video recording was played.)

19         MS. PAYERLE:  Okay.

20         **THE COURT:**  About how much longer with this

21   witness?

22         **MS. PAYERLE:**  Maybe another hour, Your Honor.

23         THE COURT:  An hour?  We'll go ahead and take

24   our morning break at this time.

25         **MS. PAYERLE:**  Yes, sir.  Thank you.

```
1              THE COURT:  Y'all have heard some proof now, but
2    don't discuss the case amongst yourselves or allow anyone
3    to discuss it with you while we take our break.  And
4    remember, no independent investigations.  Okay.  So I'm
5    going to go ahead and excuse you to the jury room.
6    Fifteen, twenty minutes or so, and we'll get back to it.
7              (Jury out at 11:15 a.m.)
8              THE COURT:  And Ms. Gutgsell, remember over the
9    break, don't discuss your testimony with anyone.
10             THE WITNESS:  Yes, sir.  Thank you.
11             THE COURT:  You can step down.
12             THE WITNESS:  Yes, sir.  Thank you.
13             (The witness complies with the request.)
14             THE COURT:  Okay.  We'll be in recess.
15             MS. PAYERLE:  Thank you.
16             (Recess at 11:16 a.m. until 11:40 a.m.)
17             THE COURT:  Anything from either side before we
18   bring in the jury?
19             MS. PAYERLE:  No, Your Honor.
20             MR. FERGUSON:  No, Your Honor.
21             THE COURT:  I do just have a couple of small
22   things.
23             With this witness, as well as with the prior
24   witness, each of the government's lawyer has reminded
25   them that they're under oath.  It didn't seem like they
```

```
 1   were having -- you were having any question -- any
 2   problems with the answers or anything, so I'm just
 3   inquiring why y'all do that.
 4        MS. PAYERLE:  Judge, it was just that with the
 5   line of questioning, the witness had seemed to express
 6   some concern about sort of describing patients in a way
 7   that was candid because it seemed impolite to use the
 8   words that they, I think, felt they wanted to use to
 9   describe those folks.  And so I think it was just a
10   matter of kind of helping the witness understand that
11   they wouldn't be viewed as impolite and that because of
12   the oath that they've taken, they're really required to
13   speak candid about the perception.
14        So in both cases, I think it was because the
15   witness had expressed, earlier, some hesitation about
16   kind of being -- using the words that they used to
17   described these patients.  I think it's just a product of
18   being kind of play people.
19        THE COURT:  Well, I'll appreciate it if y'all
20   would not refer to their oath anymore, unless you're
21   having difficulty with the witness.
22        MS. PAYERLE:  Yes, Your Honor.
23        THE COURT:  They didn't express any, so just
24   tell the witness go ahead and answer candidly.
25        MS. PAYERLE:  Yes, sir.
```

*UNREDACTED TRANSCRIPT*

```
 1          THE COURT:  If there's a problem, then we'll
 2   deal with that.
 3          And the other thing is at the rate we're going
 4   with these witnesses, I think we'll be here through the
 5   month of April.
 6          MS. PAYERLE:  Well, I don't think so, Judge,
 7   respectfully.  There are some witnesses at the beginning
 8   that are going to take a while because they have to
 9   establish -- for example, the jury has never seen these
10   toxicology reports before, and the jury doesn't know what
11   a PMP is and some of the basics.  And so these things,
12   when they're woven in, just kind of take a while.
13          These witnesses were key insiders within the
14   office that saw a lot of things, and there's just a lot
15   of topics to cover.  But I think the Court will see that,
16   as the week progresses, the witnesses will get shorter
17   and shorter and shorter.  And, you know, there will be
18   some longer witnesses because there's just a lot of
19   evidence and documents in the case, but we are trying to
20   move through it as expeditiously as possible.
21          THE COURT:  I appreciate that.  But just keep in
22   mind that -- the word you just used is foremost:
23   expeditiously.
24          MS. PAYERLE:  Yes, Judge.
25          THE COURT:  Okay.  All right.
```

*UNREDACTED TRANSCRIPT*

1          **MS. PAYERLE:**  Thank you.

2          **THE COURT:**  Mr. Ferguson, anything?

3          **MR. FERGUSON:**  No, Your Honor.

4          **THE COURT:**  All right.  Let's bring in the

5     jurors, please.

6               (Jury in at 11:43 a.m.)

7          **THE COURT:**  You may proceed.

8          **THE WITNESS:**  Thank you.

9          **THE COURT:**  Okay.  Folks, we're about ready to

10    get started.  One little note:  Mr. Richmond communicated

11    to me it's kind of cold in here right now, as did

12    Mr. Herrin.  In fact, when I came back in from my

13    chambers, it seemed like the temperature's gone down

14    about 10 degrees.

15         **THE JURY:**  It's a little chilly.

16         THE COURT:  It's a little cool; that's right.

17              But I kind of told y'all yesterday, it's an old

18    building, and this happens.  Mr. Herrin is calling GSA --

19    they maintain the building -- and asked them to adjust

20    it.  Well, sometimes when they adjust it, it will go from

21    like it is right now up to about 85.  So hopefully we can

22    find a happy median.  Congress won't approve us a new

23    building or anything like that, so we have to bear with

24    it.  So be patient with us.

25              All right.  I think we are ready now to go ahead

1    and proceed with the questioning of this -- this witness.

2              Ms. Payerle?

3              **MS. PAYERLE:**  Thank you, Your Honor.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                       **CONTINUED DIRECT EXAMINATION**

4    **BY MS. PAYERLE:**

5    Q.   Ms. Gutgsell, when we left off, we were watching

6    Mr. Young's trailer on YouTube.  And he ended it by

7    saying "Preventagenix is an experience."  And so I want

8    to talk to you a little bit about the experience of

9    working at Preventagenix.

10        What was the kind of atmosphere like working there?

11   A.   It could vary from day to day.  It was -- there was

12   always rock music playing loud.  There -- most of the

13   time, we were happy and like a family.  We all loved each

14   other very much.  Everybody, you know, cheered each other

15   on, but, you know, some days were harder than others.

16   Q.   And we'll get into some of the harder days in a

17   moment.

18        I want to ask you.  Did Mr. Young prescribe

19   controlled substances to his employees while you were

20   working there?

21   A.   He did.

22   Q.   And can you just, just so we have it on the record,

23   name those employees?

24   A.   Carla Wright, Daniel Rogers, Katie Lindsey, Chelsea

25   Carroll, Alexis -- I don't know her last name right

1  now -- Tessa James, Madison Wooley.  There were several.

2  Q.    Okay.  Did somebody named Dottie Deforest work

3  there?

4  A.    Dottie, yes.

5  Q.    What about Rebecca McGowen (phonetic)?

6  A.    Yes.

7  Q.    How about the Cortina Stewart?

8  A.    She worked in the lab.  She wasn't employed by

9  Jeff, but she worked in the clinic, yes.

10  Q.    And I believe you testified Daphne Montoya.  Did

11  she work there?

12  A.    She worked before I came there and then for a

13  couple of weeks when I was there.

14  Q.    Okay.  Were you -- did he prescribe controlled

15  substances to you?

16  A.    He did.

17  Q.    Explain to the jury about that.

18  A.    He prescribed me Xanax, one milligram, three times

19  a day.  I took Xanax from a previous provider before I

20  started working for Jeff -- excuse me; I'm sorry -- but I

21  was only prescribed .25 milligrams once or twice a day,

22  and he raised it to one milligram three times a day.

23  Q.    Did he ever do an evaluation or diagnose you

24  through a diagnosis process for anxiety?

25  A.    No.

1    Q.    Did he increase the dose slowly or immediately?

2    A.    Immediately.

3    Q.    Did he drug test you?

4    A.    We had been drug tested throughout the time we

5    worked there, but in order to get Xanax from him, no.  He

6    didn't ever order any of us to be drug tested.

7    Q.    And did he warn you of the risks of addiction?

8    A.    No.

9    Q.    Ms. Gutgsell, did you become addicted to Xanax

10   while you worked at Preventagenix?

11   A.    Yes, ma'am.

12   Q.    Aside to the Xanax addiction, were there any --

13   first of all, how did that Xanax addiction impact your

14   life?

15   A.    It basically kept me numb from reality.  I didn't

16   understand that I was addicted to them at the time.  It

17   helped me mask things that were important that I

18   should've paid better attention to.

19   Q.    And what were some of those things?

20   A.    Working in the environment that I was working in,

21   the toxic environment, the very -- just the day-to-day

22   operations that were wrong.

23   Q.    And you said that -- that you were working in a

24   day-to-day environment with a -- sort of the situation

25   was wrong.  Did you aid in that situation, sort of

1    creating that situation?

2    A.     I did.  I helped Jeff keep the clinic open.

3    Q.     And have you taken responsibility for your actions

4    in keeping Preventagenix open and for the distributions

5    of drugs that occurred there?

6    A.     I have.

7    Q.     And explain to the jury what you've done to take

8    responsibility.

9    A.     This is very hard, so forgive me, but I also,

10   throughout this process, was charged with aiding and

11   abetting Jeff in prescribing controlled substances, which

12   I did help him do by keeping the clinic open, loaning him

13   money to be able to pay employees, keep the doors open.

14   He couldn't have done that if I didn't help him.

15   Q.     Did you plead guilty to that crime?

16   A.     I did.

17   Q.     As part of that guilty plea, Ms. Gutgsell, did you

18   enter into a cooperation agreement with the government?

19   A.     I did.

20   Q.     And is your testimony today part of that agreement?

21   A.     Yes, ma'am.

22   Q.     Through your testimony today, do you hope to obtain

23   a benefit?

24   A.     Sure.

25   Q.     Okay.  And how are you, I guess -- aside from the

```
 1   Xanax addiction and the guilty plea, were there other
 2   impacts to your life in terms of the experience of
 3   working at Preventagenix?
 4   A.    Oh, of course.  Financially, it's been a huge
 5   struggle, you know.  I had to hire an attorney.
 6   Q.    Did you lend Mr. Young any money?
 7   A.    I did.
 8   Q.    Did you ever get it back?
 9   A.    I did not.
10   Q.    How much was it?
11   A.    Right at $20,000.
12   Q.    How about personally?  Did your interactions with
13   Mr. Young lead to any personal consequences for you?
14   A.    It did.  I mean, I was -- I was harassed
15   constantly.  I was in fear and terrified of him and his
16   people.  I suffer from anxiety, depression, PTSD.
17   Q.    And why were you so afraid of him?
18   A.    Because you're either for Jeff or against Jeff, and
19   if you were not for him, there was no neutral ground with
20   him.  If you weren't for him, you were automatically, in
21   his eyes, against him, and he would make your life a
22   living hell.
23   Q.    What -- what did he do?  What do you mean make it a
24   living hell?
25   A.    You know, he would just attack through himself,
```

1   through his people, through social media, through -- I'm

2   sorry -- through social media, through anything and any

3   way.  I was followed.  I was harassed.  I was scared to

4   go to the grocery store.  I was scared for my son to be

5   out in public with me because I never knew what was going

6   to happen next.

7   Q.    Just to be clear, though, were you ever -- you

8   were never physically attacked, is that right, by

9   Mr. Young?

10  A.    Oh, yes.

11  Q.    Okay.  And actually, go ahead and tell the jury

12  that story.

13  A.    Jeff tended to get drunk often.  He would come into

14  work still drunk from the night before, get drunk after

15  clinic.  And telling Jeff something that was difficult --

16  if something, you know, happened, he would fly off into a

17  rage, would get drunk.  He's spit vodka at me.  He's

18  kicked me.  He's screamed at me.  He's then turned around

19  and made me feel guilty as to I'm the only one that can

20  help him; I'm the only one that can save him.  I'm the

21  only one -- he would kill himself if it wasn't for me.

22      It was very -- an emotional abuse.  It wasn't

23  always just, you know, attacking.  Sometimes it was, you

24  know, him telling me how much he relied on me and how

25  much help -- he couldn't do it without me.

```
 1   Q.    So is it fair to say he was sometimes very kind to

 2   you?

 3   A.    Oh, yes.  Absolutely.

 4   Q.    Okay.  In the context of your guilty plea, did you

 5   take responsibility for two patients in particular --

 6   A.    I did.

 7   Q.    -- who were prescribed drugs by Mr. Young?

 8   A.    Yes, ma'am.

 9   Q.    Okay.  And who are those folks?

10   A.    Tricia Stansell and Bethany Pusser.

11   Q.    Can you tell the jury about Tricia Stansell?

12   A.    Tricia is -- she was actually the mother of Tessa

13   James who worked for us as well.

14   Q.    And what -- why did you take responsibility for

15   aiding and abetting prescriptions to Tricia Stansell?

16   A.    Because Tessa had told me that her mother was an

17   addict, recovering addict, had -- you know, had problems

18   with controlled substances before, and I knew that before

19   her coming into the clinic and Jeff prescribing her

20   medication.

21   Q.    And did you tell Mr. Young what you knew about

22   Tricia Stansell?

23   A.    I did.

24   Q.    And what was his reaction?

25   A.    He didn't care.
```

1   Q.    How about Bethany Pusser?  Who was she?

2   A.    She was someone that reached out on Facebook.  I

3   can't remember if she reached out to me or Jeff.  But --

4   and Jeff would post on Facebook, you know, if you have an

5   addiction problem, contact me; I can help.  And through

6   that post, he did -- she did contact one of us.  And she

7   came into the clinic to get help with her addiction

8   issues.

9   Q.    Did Jeff Young have any addiction counselors on

10  staff?

11  A.    No.

12  Q.    Did he run a methadone program?

13  A.    No.

14  Q.    To your knowledge, did he take any classes or

15  special training for treating addiction medicine?

16  A.    Not that I'm aware of.  No, ma'am.

17  Q.    Okay.  Did -- did Jeff Young, for a while, sort of

18  start decreasing the medicine that Bethany Pusser was on?

19  A.    He did.  At some point in time in the beginning, he

20  was prescribing her the controlled substances that she

21  was abusing and was -- he was trying to wean her down

22  from those drugs.

23  Q.    Did that ever change?

24  A.    Yes.  Then he -- she started dating his best friend

25  Kevin, and then he just started writing her more --

```
 1   different drugs.

 2   Q.    And what different drugs?  Do you know?

 3   A.    I know she got Adderall and I believe Klonopin or

 4   something like that, like a Xanax or a Klonopin or

 5   something to help relax.

 6   Q.    And did -- and when you say -- sorry.

 7         For the record, when you say "Kevin," did you mean

 8   Kevin Phillips, the person we were talking about earlier?

 9   A.    Yes, ma'am.

10   Q.    Uncle Kevin?

11   A.    Uncle Kevin, yes, ma'am.

12   Q.    Beyond the patients that you were -- you've just

13   talked about, did you ever question or confront Mr. Young

14   about his behavior of reinstatement of other patients,

15   things like that?

16   A.    Yes.

17   Q.    And how would he respond?

18   A.    Most of time he would give an explanation of why he

19   didn't care and he was the -- he was the doctor; he was

20   the provider; he knew what was best.

21   Q.    Did you ever confront him about prescribing to

22   somebody who was pregnant?

23   A.    She was -- the person that I'm thinking of, she was

24   pregnant and getting a Nubain shot, an injection, which

25   is a controlled substance.
```

1    Q.    What was her name?

2    A.    Alex Gray.

3    Q.    Okay.  And what did Mr. Young say when you

4    confronted her -- confronted him?

5    A.    That it doesn't affect the baby, that drug doesn't

6    affect the baby.

7    Q.    Okay.  Did you become aware of the requirement that

8    the clinic find a supervising physician, like a doctor to

9    oversee Nurse Practitioner Young's work?

10   A.    Yes, ma'am.

11   Q.    During the time that you were there, did Mr. Young

12   always have a supervising physician to look over his

13   work?

14   A.    No, ma'am.

15   Q.    How did he handle that in the paperwork?

16   A.    He would -- he never -- if a medical doctor had

17   quit as overseeing physician, he never changed any of the

18   documentation as far as, like, on the prescription pad.

19   He just left who was there previously, until he was able

20   to find another overseeing physician, and then we would

21   order new prescription pads and put the correct name on

22   there.  So there were times that we were basically just

23   going off the old preceptor's name.

24   Q.    And "preceptor" is a word you're using

25   interchangeably with "supervising physician"?

1   A.   Yes, ma'am.  I'm sorry.

2   Q.   No, that's just fine.

3        How many supervising physicians did Mr. Young go

4   through during the time that you were at Preventagenix?

5   You can name them if it helps to remember.

6   A.   Okay.  When I came on board, it was Charles Alston,

7   and he quit shortly after I started working there.  Then

8   it was Dr. Yogesh for approximately two weeks.  Then it

9   was Dr. Alperovich.  I don't know exactly how long he

10  was -- several months that he was involved.  And then at

11  the end was Dr. Rudin.

12  Q.   When you say "at the end," what made -- sort of

13  what was the end?  When did that happen?  What was the

14  end of things?

15  A.   For me, the end was January 11th, when the raid

16  happened.

17  Q.   Okay.  And by "raid," you mean a lawfully executed

18  search warrant at the premises of Preventagenix?

19  A.   Correct.

20  Q.   Okay.  What was -- let's talk about -- you say

21  Dr. Yogesh quit within a couple of weeks.  After that,

22  there was somebody named Dr. Alperovich?

23  A.   Yes, ma'am.

24  Q.   What was the arrangement with Dr. Alperovich?  What

25  was his job, and what was he going to get for it?

1    A.    He got paid $1,500 a month, and he was supposed to

2    come in and -- once a month -- and review medical charts

3    of patients that Jeff saw.

4    Q.    And did you say how much he would get paid for

5    that?  I'm sorry.

6    A.    1,500 a month.

7    Q.    Okay.

8    A.    I believe it was 1,500.

9    Q.    And Dr. Alperovich come to review patient records

10   in February of 2016?

11   A.    Yes, ma'am, I believe so.

12   Q.    All right.  I'm going to show you what's been

13   marked Government's 201.  It is a three-page document.

14         Are these text messages between you and Mr. Young

15   during the time that Dr. Alperovich was reviewing patient

16   charts?

17         (A document was passed to the witness.)

18   A.    Yes, ma'am.

19         **MS. PAYERLE:**  Okay.  Government moves to admit.

20         Go ahead and take a look.

21         **THE WITNESS:**  Yeah, just . . .

22         **THE COURT:**  We'll go ahead and receive it.  It

23   will be Number 13.

24         **THE WITNESS:**  Thank you.

25         **MS. PAYERLE:**  Thank you.

*UNREDACTED TRANSCRIPT*

```
 1           Let's go ahead and publish Number 13, please.

 2           (The above-mentioned item was marked as

 3    Exhibit No. 13.)

 4    BY MS. PAYERLE:

 5    Q.    All right.  So we're going to start on Page 1.  And

 6    who is on the right there, and who is on the left of

 7    these text messages?

 8    A.    On the right, it says "Joshua's mommy," which is

 9    me.

10    Q.    Who's on the left?

11    A.    Jeff Young, which is the defendant.

12    Q.    All right.  How about we read through -- you be

13    you, and I'll be Mr. Young.

14    A.    "Okay.  Did you talk to him in person?"

15    Q.    "Yep.  He shouldn't charge $1,500 for one clinic."

16    A.    "He only sign charts once.  He will need to come

17    back before the month is over to sign again."

18    Q.    Okay.  Let's go down to the next slide.

19          "Especially if we are paying $3,000."

20          What -- why was it 3,000 instead of 1,500?

21    A.    At the time, Jeff had two clinics:  One was

22    Preventagenix out north on Murray Guard Drive, and then

23    he had a downtown clinic in Jackson as well that a

24    nurse -- a different nurse practitioner was at.

25    Q.    Okay.  And then Mr. Young says:  "I'm having to
```

 1   hold his hand and explain every patient."

 2        What was happening in real time while you were

 3   texting Mr. Young about this?

 4   A.   Dr. Alperovich was actually in Jeff's office going

 5   through the different charts that were pulled for him to

 6   review, and Jeff was having to explain to him each page

 7   as far as -- Jeff's handwriting is hard to read, first of

 8   all -- but explaining what he wrote and what the

 9   different drug tests, toxicology reports meant, the

10   different -- why he prescribed what he prescribed.

11   Q.   He says:  "This is a disaster, painful."

12        Let's keep going to the next page, if we could.

13        And what did you say?

14   A.   "Oh, dear Jesus, WTF for?"

15   Q.   He says:  "I'm still here.  He's going over every

16   PMP."

17        Go ahead.

18   A.   "Be sure to show his ass all the patients we fire.

19   Oh, my God, did Katie pull a lot of pain patients out for

20   him."

21   Q.   Mr. Young says "evidently," and then let's see what

22   you respond.

23   A.   I said "fuck."

24   Q.   And then he says:  "I will show him."

25        Okay.  So could you describe Mr. Young's -- first

1    of all, what was this interaction about pulling the pain

2    patients?  Why were you and he upset that Dr. Alperovich

3    was seeing the pain patients?

4    A.    Because there are so many of them, and -- and he

5    didn't want Dr. Alperovich to realize how many pain

6    patients he was seeing.

7    Q.    Did Mr. Young talk to you about his attitude

8    generally toward the requirement that he have a

9    supervising physician?

10   A.    He didn't like the idea of having one.  He felt as

11   if he was more qualified than most medical doctors and

12   didn't need anybody's recommendation or -- or anything.

13   He thought he could handle it himself.

14   Q.    All right.  At the bottom, it says:  "We need what

15   you discussed."

16         Let's go to the next page.

17         That's Mr. Young saying that.  And at the top, what

18   did you respond?

19   A.    "I've talked to Corey about it, and he's actually

20   going to do what I talked about, so none of our -- none

21   of us are implicated.  LOL."

22   Q.    So what is -- what are you talking about here?

23   A.    My ex-husband Corey was -- we were talking about

24   getting a stamp with Dr. Alperovich's name to stamp his

25   name on the charts instead of physically showing

1    Dr. Alperovich the charts.

2    Q.    And who was going to do that stamping?

3    A.    Corey was.

4    Q.    And that's so that none of you were implicated?

5    A.    Correct.

6    Q.    And Mr. Young knew about this plan?

7    A.    Yes.

8    Q.    Was Dr. Alperovich the only supervising physician

9    that you thought about or actually did get a stamp with

10   his name?

11   A.    I don't believe that we ever got the stamp for

12   Dr. Alperovich.  There was a stamp there, before I

13   started working there, for Dr. Alston.

14   Q.    And did you ever see Jeff Young using Dr. Alston's

15   stamp?

16   A.    Yes.

17   Q.    Okay.  Describe the circumstances under which he

18   was stamping Dr. Alston's name.

19   A.    There ever several different times that the board

20   of nursing sent out a list of patients that they wanted

21   to -- they were doing an investigation of Jeff, the board

22   of nursing.  And they were wanting to see different

23   patient charts, several, several, several patient charts.

24   And we would get the receptionist to pull the charts, and

25   I would go through the charts looking at different things

1   to see when the last time a supervising physician had

2   actually been in and reviewed this chart, if they'd ever

3   reviewed the chart; flag different things if I thought

4   Jeff needed to look at them.  And he would go through

5   those charts and add more stuff, add more documentation

6   to the charts and use Dr. Alston's stamp to stamp the

7   chart as if Dr. Alston was there and signed the chart.

8   That was required of -- a physician was required to

9   actually sign a hundred percent of pain patient charts, a

10  hundred percent.

11  Q.    So this -- so he was making it look to the medical

12  board as though that had happened?

13  A.    Correct.

14  Q.    I see.

15        Did you -- did there come a time when

16  Dr. Alperovich also quit?

17  A.    Yes, ma'am.

18  Q.    All right.  I'm going to show you a document that

19  is seven pages.  It's internally marked as 202.

20        (A document was passed to the witness.)

21  **BY MS. PAYERLE:**

22  Q.    Are these text messages with you around the time

23  that Dr. Alperovich quit?

24  A.    Yes, ma'am.

25        **MS. PAYERLE:**  Okay.  Move to admit.

1          **THE COURT:**  We'll go ahead and receive it, seven

2   pages of texts.

3          **MS. PAYERLE:**  Thank you.

4          **THE COURT:**  Exhibit Number 14.

5          (The above-mentioned item was marked as

6   Exhibit No. 14.)

7          **MS. PAYERLE:**  Let's go ahead and publish

8   Exhibit 14, please.

9          Okay.  So let's fast forward.  Go ahead and flip

10  to the next page.  Flip to the next page, to be

11  expeditious.

12         Oh, back up.

13         **MS. SILVERBERG:**  Oh, sorry.

14         **MS. PAYERLE:**  There we go.  Sorry.

15  **BY MS. PAYERLE:**

16  Q.    Okay.  Let's -- let's blow up the top half of this

17  page down to, I think, like here, let's say.  There we

18  go.

19         All right.  Is this a series of text messages

20  between you and Dr. Alperovich?

21  A.    Yes, ma'am.

22  Q.    And is this in June -- on June 9th of 2016, the

23  column --

24  A.    Yes, ma'am.  Yes, ma'am.

25  Q.    Okay.  What do you -- what do you say to him on

1   that day?

2   A.    I sent a message to him that said:  "Good morning.

3   I'm not telling Jeff about you resigning until this

4   afternoon when the other NP" -- which is nurse

5   practitioner -- "comes in.  Please don't say anything to

6   him this morning about it."

7   Q.    Dr. Alperovich says:  "I was going to call him.

8   Why is it a concern?

9         And what did you say?

10  A.    "He's a loose cannon.  I don't want patients to

11  suffer this morning.  At least when April gets here, she

12  can see the patients."

13  Q.    Okay.  Why -- I guess, what was your concern about

14  Jeffrey Young and telling him that Dr. Alperovich had

15  quit that day?

16  A.    I knew that he would become irate and start

17  drinking and --

18  Q.    And did he?

19  A.    He did.

20  Q.    And have you already told the jury what happened on

21  that day?

22  A.    Yes.  That's the day that he spit vodka and kicked

23  me.

24  Q.    After you lost Dr. Alperovich, how long was it

25  before you found another supervising physician?

 1    A.    It was at least 30 days, if not longer.

 2    Q.    And let's take a look at a nine-page document the

 3    government's labeled 205.

 4          (A document was passed to the witness.)

 5    **BY MS. PAYERLE:**

 6    Q.    And is this a series of e-mails with a man named

 7    Andrew Rudin and documents attached?

 8    A.    Yes, ma'am.

 9    Q.    And who is Andrew Rudin?

10    A.    He was the final overseeing doctor, overseeing

11    physician.

12          **MS. PAYERLE:**  Move to admit, Your Honor.

13          THE COURT:  We'll go ahead and receive them.

14          **MS. PAYERLE:**  Thank you.

15          **THE COURT:**  Nine pages, exhibit 15.

16          (The above-mentioned item was marked as

17    Exhibit No. 15.)

18          **MS. PAYERLE:**  Let's go ahead and publish

19    Exhibit 15.

20    **BY MS. PAYERLE:**

21    Q.    Let's show -- let's go ahead and flip down a page.

22          Is this a contract that you helped sort of

23    facilitate between Jeff Young and Andrew Rudin?

24    A.    Yes, ma'am.

25    Q.    On Page 3, at the bottom half, I think, starting at

1  J, K, and L -- keep going all the way down.  There we go.

2      Did Mr. Rudin, in this contract, agree to review

3  and sign patient charts, visit the campus of

4  Preventagenix clinic, and do the other things indicated

5  here?

6  A.    Yes, ma'am.

7  Q.    Did he ever, to your knowledge, visit

8  Preventagenix?

9  A.    No, he never did.

10 Q.    All right.  At this point, I'm going to show you --

11 I'm going to show you what's been internally marked as

12 Government's 204.  It's just one page.  It's a single

13 text message.

14      (A document was passed to the witness.)

15 A.    Yes, ma'am.

16 **BY MS. PAYERLE:**

17 Q.    And is that a text message about Dr. Rudin?

18 A.    Yes, ma'am.

19 Q.    And is it to you?  Sorry.  From you?

20 A.    It's from me, yes, ma'am.

21 Q.    Okay.

22      **MS. PAYERLE:**  Move to admit, Your Honor.

23      **THE COURT:**  Go ahead and receive the text.  That

24 will be Exhibit 16.

25      (The above-mentioned item was marked as

 1  Exhibit No. 16.)

 2  **BY MS. PAYERLE:**

 3  Q.    Who was Dr. Rudin to Mr. Young?

 4  A.    He was a friend of -- they were each other's

 5  friend.

 6  Q.    They're friends.

 7        And where did Dr. Rudin live at the time?

 8  A.    I believe in Chicago.  It was definitely not

 9  Tennessee.  It was somewhere like Chicago or somewhere in

10  that area.

11  Q.    Okay.  And I think I asked you this.  Did he ever,

12  to your knowledge, visit Preventagenix?

13  A.    No, ma'am.

14  Q.    I'm going to show you -- let's go ahead and pull

15  up -- what was 204, the last exhibit we just --

16        **MS. SILVERBERG:**  16.

17        **MS. PAYERLE:**  16.  Okay.  Let's pull up 16.

18  **BY MS. PAYERLE:**

19  Q.    And what did you text Tessa James there?

20  A.    It says:  "Do we have a "Dr. Rudin" stamp in yet?"

21  Q.    Was the plan also to get a stamp for Dr. Rudin's

22  signature?

23  A.    Correct.  Yes, ma'am.

24  Q.    To be used in the same way as the prior stamps we

25  talked about?

1  A.    Not only that, but also it was common to stamp a

2  doctor's signature on certain different orders that they

3  necessarily didn't have to sign in person, but --

4  Q.    Okay.

5  A.    -- primarily for the charts.

6  Q.    I'm going to show you -- and as quickly as I can

7  here -- some further text messages with Mr. Young and a

8  four-page document labeled Government's 216.

9          (A document was passed to the witness.)

10 **BY MS. PAYERLE:**

11 Q.    Are these text messages between you and Mr. Young

12 about Dr. Rudin?

13 A.    Yes, ma'am.

14         **MS. PAYERLE:**  Move to admit.

15         **THE COURT:**  Be 17.

16         (The above-mentioned item was marked as

17 Exhibit No. 17.)

18         **MS. PAYERLE:**  Thank you.

19         Let's go ahead and publish Exhibit 17, please.

20 **BY MS. PAYERLE:**

21 Q.    Ms. Gutgsell, was it easy or difficult to get

22 Dr. Rudin to pay attention to the clinic or to do his

23 job?

24 A.    It was very difficult.

25 Q.    All right.  Let's start -- these start actually at

 1   the bottom, so let's go through -- all the way to the --

 2   kind of the last of these.  These start at the bottom and

 3   go back up.

 4          **MS. PAYERLE:**  So Ms. Silverberg, if you could

 5   just stroll to the last page of the exhibit.

 6   **BY MS. PAYERLE:**

 7   Q.   Okay.  And they start with a text message from you,

 8   so let's go blow up the top three texts, like the

 9   whole -- the whole part there in writing.

10        We'll start with -- you be you; I'll be Mr. Young,

11   and start at the bottom.

12   A.   "Did you get the signed contract to Nashville

13   attorney?"

14   Q.   "Yes.  Meeting with him in Nashville, Friday,

15   February the 13th."

16   A.   "Good.  What time?"

17   Q.   Okay.  Let's back out of that and go to the second

18   page and blow it up, please.

19        "The 13th is a Monday.  Sorry.  It's January,

20   Friday the 13th," says Mr. Young.

21        What do you say?

22   A.   "Okay.  Good.  I'm going to have to fly you to

23   Chicago soon.  Pick a weekend.  I need tons of stuff

24   signed by Rudin again.  It's impossible to get him to

25   sign and mail back."

1  Q.   Mr. Young says:  "Okay."

2       Let's go to the first -- or the next page up.  What

3  do you say?

4  A.   "I can fly you for free from Jackson.  I'll give

5  you enough cash from Preventagenix.  Rich will never

6  know."

7  Q.   Who's Rich?

8  A.   He was one of the owners.

9  Q.   Okay.  Mr. Young says:  "Perfect."

10      You say?

11 A.   "I'll plan with Rudin when a good time for -- when

12 is good for him, unless you want to."

13 Q.   (Indiscernible).

14      **THE COURT REPORTER:  Excuse me.  What did you**

15 **say?**

16 **BY MS. PAYERLE:**

17 Q.   "You can?"

18      Let's go to the top.

19      Mr. Young says:  "You know my schedule better than

20 I."

21 A.   "He's so difficult to nail down on anything."

22 Q.   Mr. Young says:  "Yeah, the perfect preceptor."

23      Did he ever talk to you about why Mr. Rudin or

24 Dr. Rudin was the perfect preceptor?

25 A.   Because he wasn't ever in the clinic, wasn't

1    breathing down Jeff's neck, wasn't asking questions.  He

2    didn't care what was going on either.

3    Q.    And did Dr. Rudin ever sign any charts for the

4    clinic?

5    A.    He -- he never came to the office to sign any

6    charts, but I did mail him charts for him to review and

7    sign.

8    Q.    Did you mail him complete charts?

9    A.    No.  I would just mail him the page that I needed

10   him to sign.

11   Q.    Okay.  And did he sign and send those back?

12   A.    He did.

13   Q.    And did Mr. Young pay Dr. Rudin his thousand

14   dollars for a month?

15   A.    He did.

16   Q.    Ms. Gutgsell, who hired and fired people at

17   Preventagenix during the time that you were there?

18   A.    Jeff or I did.

19   Q.    Okay.  And who made the decision ultimately about

20   who got hired and fired?

21   A.    Jeff.

22   Q.    Did he pay the rent for Preventagenix out of a

23   Preventagenix account?

24   A.    He did.  I wrote the check, he signed it, and I

25   mailed it.

1    Q.    Okay.  And did he lease or maintain the Murray

2    Guard property for anything else besides the medical

3    practice that we've been discussing?  Like, was there

4    anything else going on there besides the medical practice

5    Preventagenix?

6    A.    Well, like, he would have different Botox parties

7    or art parties or just regular parties in general.

8    Q.    But related to the medical practice or unrelated?

9    A.    Unrelated.

10   Q.    Okay.  Was Preventagenix primarily a medical

11   clinic?

12   A.    Yes, ma'am.

13   Q.    Okay.  You testified about sort of your -- how you

14   took responsibility for your role in Preventagenix.  For

15   as long as you've known him, did Jeff Young ever take

16   responsibility for his part?

17   A.    He has never taken responsibility.

18   Q.    Has he blamed others?

19   A.    Yes, ma'am.

20   Q.    Can you tell the jury who -- who he's blamed for

21   his troubles over the years?

22   A.    He's blamed me.  He's blamed his ex-wife.  He's

23   blamed the last office manager before me.  He's blamed

24   the government.  He's blamed everyone but himself.

25   Q.    Let's take a look at what's been premarked as

 1   Exhibit 711.  It's a one-page document.

 2             (A document was passed to the witness.)

 3   **BY MS. PAYERLE:**

 4   Q.    A letter from Humana?

 5   A.    Yes, ma'am.

 6   Q.    Dated December 22, 2016, and addressed to Jeff

 7   Young?

 8   A.    Yes, ma'am.

 9        **MS. PAYERLE:**  Move to admit, Your Honor.

10        **THE COURT:**  That will be Number 18, the letter.

11             (The above-mentioned item was marked as

12   Exhibit No. 18.)

13        **MS. PAYERLE:**  Number 18.  And let's go ahead and

14   publish.

15   **BY MS. PAYERLE:**

16   Q.    Now, is this a letter from an insurance company?

17   A.    Yes, ma'am.  Humana.

18   Q.    Let's take a look at the top two paragraphs.  It

19   says:  "You have been" -- the second paragraph there

20   says:  "You have been identified as being within the top

21   one percent of opioid prescribers, excluding

22   oncologists."

23        And he encloses a report.  Do you see that?

24   A.    Yes, ma'am.

25   Q.    Let's back out a little bit or back out to the --

1    Okay.  There's handwriting on this letter.  Whose

2    handwriting is that?

3    A.    That is Jeff's.

4    Q.    Was this letter an example of kind of people

5    questioning his methods?

6    A.    Yes, ma'am.  There was different letters about

7    the -- that were about the same thing.

8    Q.    Who else were questioning, at this time, the amount

9    of prescribing that he was doing?

10   A.    Other insurance companies.  He was being

11   investigated by the board of nursing as well.

12   Q.    And did he ever express his belief that somebody

13   was behind all of this?

14   A.    Yes.  He -- there's the conspiracy theories

15   between, you know, another nurse practitioner in town

16   named John Michael Briley; he was behind it, his ex-wife

17   Dawn, the government, his haters.

18   Q.    Okay.  You mentioned haters.  At this time, have

19   you ever seen a video posted on YouTube about Uncle Kevin

20   talking about Mr. Young and his haters?

21   A.    Yes, ma'am.

22   Q.    Okay.

23         **MS. PAYERLE:**  At this time, Your Honor, the

24   government would admit that video as -- it's marked 609.

25         **THE COURT:**  Okay.  Video.  It will be Exhibit

1    Number 19.  How long is it?

2          **MS. PAYERLE:**  I believe it's only 30 seconds

3    maybe.

4          It's two minutes and 30 seconds.

5          **THE COURT:**  Go ahead.

6          **MS. PAYERLE:**  Thank you, Your Honor.

7          (The above-mentioned item was marked as

8    Exhibit No. 19.)

9          (An audio-video recording was played.)

10          MS. PAYERLE:  I'll take that down.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3          **THE COURT:**  I think this is a good place for us

4     to break for lunch.

5          **MS. PAYERLE:**  Okay.  Your Honor, that's fine.

6          **THE COURT:**  All right.  Ladies and gentlemen,

7     your lunch is waiting for you in the jury room back

8     there, so going to take a little time for you to go ahead

9     and enjoy lunch.

10          Let's see.  I'm going to look at that clock.

11     It's almost 12:30, so we'll pick this up at 1:30.  Go

12     ahead and enjoy.  Remember my admonitions about, you

13     know, independent investigations, things like that.

14     Don't discuss the case.  I may have mentioned before, you

15     need to leave your notebooks in your chairs there.  They

16     will be there when you come back in.  Okay.

17          Let's go ahead and break for lunch.

18          (Jury out at 12:23 p.m.)

19          **THE COURT:**  Remember don't discuss your

20     testimony over the lunch break.  Okay?

21          **THE WITNESS:**  Yes, sir.  Thank you.

22          **THE COURT:**  You can step down.

23          (The witness complies with the request.)

24          **THE COURT:**  Okay.  We'll be in recess.

25          **MS. PAYERLE:**  Judge, whatever it's worth, I only

*UNREDACTED TRANSCRIPT*

1   have one question, just to your earlier --

2           **THE COURT:**  I'm sorry?

3           **MS. PAYERLE:**  I only have one more question, to

4   your earlier concern.  We've been cutting a fair amount.

5           **THE COURT:**  Appreciate it.  Thank you.  We'll be

6   in recess.

7           (The morning session concluded at 12:24 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **C E R T I F I C A T E**

2

3

4            I, LASHAWN MARSHALL, RPR, LCR, do hereby
     certify that the foregoing 145 pages are, to the best of
5    my knowledge, skill, and abilities, a true and accurate
     transcript from my stenotype notes of the Jury Trial
6    proceedings on the 28th day of March, 2023, in the matter
     of:

7

8

9

10

11   United States of America

12   vs.

13   Jeffrey W. Young, Jr.

14

15   Dated this 28th day of March, 2023

16

17

18

19

20

21

22

23                          _S/Lashawn Marshall_
                            Lashawn Marshall, RPR, LCR
24                          Official Court Reporter
                            United States District Court
25                          Western District of Tennessee


                         *UNREDACTED TRANSCRIPT*

**EXAMINATION OF KRISTIE GUTGSELL**                    7

1                         CONTINUED DIRECT EXAMINATION

2    BY MS. PAYERLE:

3     Q.   Ms. Gutgsell, I have only a few more questions for

4    you.  I'd like to show you -- were you Mr. Young's friend on

5    Facebook?

6     A.   Yes, ma'am.

7     Q.   You saw a lot of his Facebook posts?

8     A.   Yes, ma'am.

9     Q.   I'm going to show you a one-page document we marked

10   908.  Is this a post by Jeff Young about one of his patients?

11    A.   Yes, ma'am.

12              MS. PAYERLE:  All right.  The Government will

13   move to admit.

14              THE COURT:  That would be Exhibit No. 20.

15              (Exhibit 20 marked and received.)

16              MS. PAYERLE:  Let's go ahead and publish

17   Exhibit 20 to the jury, if you would.

18   BY MS. PAYERLE:

19    Q.   Ms. Gutgsell, do you see at the top of the post that

20   says:  Six months clean today.  So proud of Aaron Beaver --

21   with some numbers in there -- love you, dude.  You and your

22   story inspires and humbles me.  If you are out there and

23   think there's no hope, please contact us at PREVENTAGENIX and

24   let us help facilitate your recovery and get your life back?

25    A.   Yes, ma'am.

UNREDACTED TRANSCRIPT

EXAMINATION OF KRISTIE GUTGSELL                    8

1    Q.   And do you see where Jeff Young writes below:  This is

2    why I do what I do every day?

3    A.   Yes, ma'am.

4    Q.   And he says:  This is why I put up with all the

5    bullshit and heat?

6    A.   Yes, ma'am.

7    Q.   He says:  This story right here is why I put myself

8    out there on social media.  Aaron Beaver and I would never

9    had met had there not been controversial Facebook posts about

10   myself addressing addiction as a disease.

11        Do you see that?

12   A.   Yes, ma'am.

13   Q.   Can you -- did you know Aaron Beaver?

14   A.   I did.

15   Q.   Can you tell the story about how Aaron Beaver came to

16   be -- just the very beginning of that story, how he came to

17   be a patient at PREVENTAGENIX?

18   A.   It goes back to where Jeff had posted on Facebook

19   about if you need help with addiction, please contact me.

20   And he either contacted myself or Jeff.  I don't remember

21   which way it went.

22   Q.   And he became a patient at PREVENTAGENIX?

23   A.   Yes, ma'am.

24   Q.   And was it documented in his patient file that he was

25   suffering from addiction?

1   A.   Yes, ma'am.

2   Q.   To opioids?

3   A.   Yes, ma'am.

4   Q.   Did Jeff Young at some point begin prescribing opioids

5   to Aaron Beaver?

6   A.   Yes, ma'am.

7   Q.   And do you remember what the name of that drug was?

8   A.   No.

9   Q.   Okay.

10  A.   I don't, no.

11  Q.   Thank you.  Ms. Gutgsell, is it fair to say that

12  you -- and I think this is just based on what you've

13  testified --

14          MS. PAYERLE:  We can take the exhibit down.

15  BY MS. PAYERLE:

16  Q.   That working at PREVENTAGENIX was a volatile

17  experience for you?

18  A.   Yes, ma'am.

19  Q.   Tell the jury, if you would, please, why did you stay

20  for so long?

21  A.   It -- if you don't stay on Jeff's team and you do

22  things against Jeff, he goes after you, whether it be through

23  social media, through his friends.  Publicly on Facebook, he

24  would just embarrass you and just tell stories and talk about

25  you and harass you and he did that -- I watched it numerous

**EXAMINATION OF KRISTIE GUTGSELL**                    10

```
 1   times, and I didn't want to be a part of that embarrassment.
 2              MS. PAYERLE:  Your Honor, if I may have just one
 3   moment, please.
 4              THE COURT:  Okay.
 5              MS. PAYERLE:  Thank you, Your Honor.  At this
 6   time, we pass the witness.
 7              THE COURT:  All right.  Thank you.
 8              And, Mr. Ferguson, is there any cross?
 9                      CROSS-EXAMINATION
10   BY MR. FERGUSON:
11     Q.   Good afternoon.
12     A.   Yes, sir.  Good afternoon.
13     Q.   I've been corrected twice over talking over the
14   witness, so I'm going to try hard not to overtalk you.
15     A.   Okay.
16     Q.   When did you start with Mr. Young?
17     A.   It was August, 2015.
18     Q.   And was that after Ms. Goslee had left?
19     A.   Yes, sir.
20     Q.   And you were friends with Ms. Goslee?
21     A.   Yes, sir.
22     Q.   And she recommended the job to you?
23     A.   No, she did not.
24     Q.   She just told you about it or --
25     A.   No.  She -- I had become friends with Jeff at this
```

EXAMINATION OF KRISTIE GUTGSELL                          11

1   point too.

2       Q.   That makes sense.  And part of your job was to

3   schedule all of the appointments and the healthcare

4   providers?

5       A.   No, that was not.  I didn't -- I scheduled patients

6   sometimes, but we had receptionists that scheduled most of

7   those appointments.

8       Q.   Okay.  I'm going to pass this to you.  Did you see

9   this already?

10      A.   Yes, sir, I believe this is the same one.

11      Q.   It's Exhibit 8 already admitted.  This was the

12  schedule that the Government was talking to you about?

13      A.   Yes, sir.

14      Q.   Did you prepare this?

15      A.   No.  This is what you can print off from the computer

16  when the -- when a patient calls for an appointment.  You put

17  it in the computer, and then you can print, like, the master

18  list, which is what this is.

19      Q.   Okay.  Well, I just want to zoom in here a little bit

20  over here on this far side on the right where it says

21  "comments"?

22      A.   Yes, sir.

23      Q.   You were saying that the one-month follow-ups mean

24  what?

25      A.   Typically, those patients are coming in for controlled

 1  substances, and they have to come in monthly.

 2     Q.    Do they have to be controlled substances to be a

 3  one-month follow-up?

 4     A.    That's what these appointments were.

 5     Q.    Okay.  And what is this?

 6     A.    Echo.

 7     Q.    Did Jeff do echoes?

 8     A.    He did not.

 9     Q.    By echo, do you mean echocardiogram?

10     A.    Yes, sir.

11     Q.    There was another provider in the clinic that did

12  echoes?

13     A.    Yes, sir, on certain days.

14     Q.    Certain days?

15     A.    Not every day.

16     Q.    And you've got:  Fasting labs, echoes, follow-up.

17  There's a lot of stuff going on here on a day-to-day basis;

18  is that correct?

19     A.    Yes, sir.  There's a lot of patients.

20     Q.    And for the majority, it's all insurance payments

21  except for -- what does private pay mean?  Is that cash?

22     A.    Yes, sir.

23     Q.    Okay.  So you have private pay, commercial insurance

24  is insurance, Medicare is insurance, BlueCare, private

25  insurance, private insurance.  There's a lot of -- I think

1   you were saying there was a lot of people paying cash, but it
2   looks like there's only a handful of cash payments on this
3   day.
4       A.   On this day.
5       Q.   That's pretty typical for a day?
6       A.   Not necessarily.  Each day varies.
7       Q.   Okay.  And then when you have these things that say,
8   like, new patient, wants to see April.  Who is April?
9       A.   April was another provider that came, I believe, two
10  days a week.
11      Q.   Okay.  So to be fair, on what's been marked as
12  Exhibit 8, there's at least another person doing echoes, and
13  then there's April, who was another nurse practitioner also
14  in the office on this day; is that correct?
15      A.   If it says echo next to the patient, they would be
16  seen for an echo only, correct.
17      Q.   And then April was another nurse practitioner?
18      A.   Yes.  She was only there a couple of days a week.
19      Q.   And follow-up, Daniel, see patient drug screen?
20      A.   Correct.
21      Q.   Who is Daniel?
22      A.   Daniel was another employee.
23      Q.   Okay.  And so this other employee is now doing the
24  drug screens on this patient here?
25      A.   No.  More than likely, what that meant was Daniel

1   needed to see the patient because of the patient's drug

2   screen, and if Daniel was being told to come in, it was

3   because of a drug screen -- the patient had failed the drug

4   screen.

5       Q.   This being somebody had followed up with a drug

6   screen, and the patient needed counseling?

7       A.   It's two different things, actually.

8       Q.   Okay.

9       A.   So the follow-up would be the patient was there for

10  medication.

11      Q.   Correct.

12      A.   And also Daniel needed to talk to the patient about

13  their drug screen.

14      Q.   Yes, ma'am.  So -- but on the chart or on this -- I'm

15  not sure what the sheet is called.  What do you call the

16  sheet?  Just the appointment list?

17      A.   Yes, like, a master list.

18      Q.   Master list?

19      A.   Yes, sir.

20      Q.   There's a notation on here that this person is coming

21  in for a follow-up, and Daniel needs to see them about their

22  drug screen --

23      A.   Correct.

24      Q.   -- to counsel them about their drug screen?

25      A.   Right.  That's right.  Yes, sir.

EXAMINATION OF KRISTIE GUTGSELL                          15

1   Q.   Okay.  This is not saying that this person is the only

2   person getting a drug screen this day?

3   A.   Right.  That's just talk to the patient about the drug

4   screen.

5   Q.   And there's a number of people that come in, bloody

6   stool, no energy, felt real bad, a new patient.  I guess,

7   this new PCP, is that primary care physician?

8   A.   Yes, sir, that's what that means.

9   Q.   Does that mean that Mr. Young is going to become the

10  PCP?

11  A.   More than likely, yes, sir.

12  Q.   Okay.  They're in need of a primary care physician?

13  A.   Correct.  Yes, sir.

14  Q.   Is it called primary care physician even if he's not a

15  physician?  Is it just in the business you called it a PCP?

16  A.   PCP, yes, sir.

17  Q.   All right.  It just means the person who is the

18  general person to kind of keep up with their health?

19  A.   Correct.  Yes, sir.

20  Q.   Somebody has another follow-up, and it's also --

21  apparently, they had needed to have some more testing done

22  that day?

23  A.   Yes, sir.

24  Q.   Okay.  One month follow-up and see Kristie for sleep

25  study?

UNREDACTED TRANSCRIPT

EXAMINATION OF KRISTIE GUTGSELL                    16

1    A.   Correct.

2    Q.   Who is Kristie?

3    A.   That's me.

4    Q.   And what are you doing with the sleep study?

5    A.   Jeff had sleep study machines in his office, and it

6    was where we could show the patient how to use the machine so

7    they could bring it home with them to get a sleep study done.

8    Q.   Okay.  Is that a legitimate medical procedure?

9    A.   It is, yes, sir.

10    Q.   Okay.  And it's kind of in the course and scope of

11    what a healthcare provider would provide for their patients?

12    A.   Correct.  Yes, sir.

13    Q.   Thyroid panel, that's within the normal scope and

14    course of what a medical provider would provide for their

15    patients?

16    A.   Well, what that thyroid panel draw means, that's a

17    blood test, so the phlebotomist would have drawn that panel,

18    yes, sir.

19    Q.   But it's ordered, and somebody in the office does it,

20    and it's sent out --

21    A.   Right.

22    Q.   -- there's an analysis done, it comes back in, and

23    Jeff would read it and make medical decisions based on it?

24    A.   Yes, you're correct.

25    Q.   Did you have problems with Jeff -- Mr. Young, and his

1   not wanting to fire people who had failed drug screens for

2   marijuana?

3     A.   Ask me that again.

4     Q.   Was there a problem with people would fail a drug

5   screen for marijuana and Jeff would unfire them?

6     A.   Marijuana wasn't even on our drug screen.

7     Q.   Okay.  Y'all just didn't even test for that, did you?

8     A.   No, sir.

9     Q.   Can you test for it?  I don't know.

10     A.   I'm assuming you can, but he didn't have it on his

11   screening.

12     Q.   Okay.  Would it be fair to say he would not have been

13   concerned about it because he was a pro-marijuana advocate?

14     A.   Correct.

15     Q.   He felt that it was a -- it was just as good as

16   medical drugs, medical prescriptions for treating certain

17   symptoms?

18     A.   That's what he believed, yes, sir.

19     Q.   And since that time, many states have grown to accept

20   that as part of the medicine prescription regimen for people?

21   It's a dumb way of saying Mississippi and Arkansas have

22   medical marijuana?

23     A.   I don't know that.  I don't keep up with that.

24     Q.   Okay.  You talked about back-door patients?

25     A.   Yes, sir.

EXAMINATION OF KRISTIE GUTGSELL                    18

1    Q.    Your concern about back-door patients was, you didn't

2    think they were being charted correctly or that they were

3    getting drugs they didn't need?  What's the issue with back

4    door, the VIP back door?  What's the concern there?

5    A.    Okay.  So back-door patients and VIP patients are two

6    totally different things.

7    Q.    VIP, people paid extra to have more personal

8    connection to Jeff.  He still would see them as patients.

9    The back-door were kind of like his special people?

10   A.    Correct.  Some of those patients didn't have charts at

11   all.

12   Q.    Some of those people were including his attorney that

13   was handling his divorce at that time?

14   A.    Yeah, he was actually a back-door patient as well.

15   Q.    Mr. Donahoe would come and go and meet with Jeff

16   while -- and this was while Jeff was going through this

17   divorce with Dawn?

18   A.    And get prescriptions and injections and shots as

19   well.

20   Q.    Okay.  Did Jeff ever receive -- as far as you know,

21   without maybe disclosing what the attorney-client

22   conversation was, was there -- during this time at the back

23   door that discussions were held about either Jeff's divorce

24   or whether or not the practice was being run correctly?

25   A.    Was that talked about?

1    Q.    Yeah.

2    A.    Yes, sir.

3    Q.    Jeff was receiving legal advice at this time?

4    A.    Jeff had friends that were attorneys as well, yes.

5    Q.    And that would come to the back door?

6    A.    Yes.

7    Q.    And would see the -- be able to be inside the clinic

8    during this time?

9    A.    Yes, sir.

10   Q.    Okay.  When you first started working there to the

11   time of the -- you and I call it -- the raid.  The Government

12   called it the legally executed search warrant on the premises

13   of PREVENTAGENIX.  The raid --

14   A.    Yes, sir.

15   Q.    -- did Jeff's behavior, I think you described it as,

16   spiralled?

17   A.    It had spiralled.

18   Q.    It had gone really bad?

19   A.    It had, yes, sir.

20   Q.    Did you see that -- did his interaction -- that's a

21   terrible way to ask that.  Let me ask you a good question --

22   A.    Okay.

23   Q.    -- just a second to figure out how to ask you.

24   A.    Yes, sir.

25   Q.    Was some of it in relation to the divorce, the stress

1    of his divorce?

2        A.    It was, yes, sir.

3        Q.    It was really bad, wasn't it?

4        A.    It was terrible.

5        Q.    I mean, they were going after each other?

6        A.    Nonstop.

7        Q.    Each of them were giving it as good as they were

8    getting it?

9        A.    Yes, sir.

10       Q.    On social media, in person, through third parties, it

11   got hard?

12       A.    Yes, sir.

13       Q.    It affected the job?

14       A.    Yes, sir.

15       Q.    It affected Jeff?

16       A.    It did.

17       Q.    It -- maybe use the word -- broke him?

18       A.    I could say that too, yes, sir.

19       Q.    It was ugly?

20       A.    It was.

21       Q.    Did you know Jeff before you started working with him

22   previously as a nurse practitioner?

23       A.    I knew of him.  I didn't know him on a friendly basis.

24       Q.    You knew of his reputation within the community as a

25   good healthcare provider?

EXAMINATION OF KRISTIE GUTGSELL                    21

1    A.    No, not even so much that.  He became very vocal as

2    his divorce, everybody saw him on Facebook.

3    Q.    Jackson is small?

4    A.    Small town, yes.

5    Q.    It's a hundred thousand people, but it's a small town?

6    A.    Everybody knows everybody, yes, sir.

7    Q.    And there's this thing called Topics.

8    A.    Uh, yes.

9    Q.    We don't use Topics a lot in Shelby County.  What is

10   Topics?

11   A.    Topics was horrible.  It's where you could post -- it

12   was online, and you could post anonymously.  And you could

13   say whatever you wanted to say, and it was completely

14   anonymous.  It didn't matter what was said.

15   Q.    Everything as bad as Facebook and every other social

16   media is, this was an anonymous platform where people got

17   away with just slandering each other?

18   A.    It was terrible.  Yes, sir.

19   Q.    And posting things they should not have been posting?

20   A.    Correct.

21   Q.    Pictures?

22   A.    Correct.

23   Q.    Health records?

24   A.    I don't remember that, but it wouldn't surprise me.

25   Q.    Okay.  And Jeff kind of went to battle on that too,

1   didn't he?

2      A.    Yes.  He posted on Topics as well.

3      Q.    You talked about, I think it was Ben Elston or maybe

4   his dad being Jeff's bodyguard.  Why would Jeff need a

5   bodyguard?

6      A.    It's Ben Elston.  His dad did come to the clinic as

7   well.

8      Q.    Did he need a bodyguard, or was this just something in

9   Jeff's head that made him more popular and cool?

10      A.    Probably the popularity.  I didn't go out with him so

11   I don't know what threats he received when he was out.  I

12   think maybe he felt more comfortable with a big guy beside

13   him.

14      Q.    When we talk about haters, based on what you saw going

15   on and through social media, there was as much hate being

16   given as received.  There were haters, were there not?

17      A.    Yes, sir, there was.

18      Q.    And as he's falling apart, as he's spiralling through

19   this divorce, did he begin to come into the clinic either

20   drinking or drunk?

21      A.    That happened the entire time I worked for him.

22      Q.    Did it get worse as you worked for him?

23      A.    There were periods of time that were worse than

24   others.  So things could be okay for a couple of weeks, and

25   then for a couple of weeks be horrible; and then be okay

1    again for a couple of weeks and then be horrible again.

2        Q.    He just kind of cycled in and out?

3        A.    He did.

4        Q.    Did he cycle in and out of this Doc Rock persona?  Was

5    it something that kind of came and went too?

6        A.    The whole time that I was around him, once that

7    started up, he kept that persona the whole time.

8        Q.    He -- not only did he keep it, he tried to promote it?

9        A.    He did, yes, sir.

10       Q.    And I think you said even to the point of paying

11   people to come in and film --

12       A.    -- a reality show, yes, sir.

13       Q.    Was it called a pilot, trying to shop it around for

14   TV?

15       A.    I think that's what it was, yes, sir.

16       Q.    He thought a lot of himself, didn't he?

17       A.    He did.

18       Q.    And I think you said in his mind he didn't think he

19   was doing anything wrong?

20       A.    Correct.

21       Q.    I was looking at the text messaging between you and

22   Mr. Young when you were testifying when he was sitting there

23   with Dr. Alperovich?

24       A.    Alperovich.

25       Q.    Dr. Al?

EXAMINATION OF KRISTIE GUTGSELL                    24

1    A.    Dr. Al, yes, that's easier.

2    Q.    Did I notice that it started, like, about 5 p.m. in

3    the afternoon and went to about one o'clock in the morning?

4    A.    Mine and Jeff's text messages probably did.

5    Q.    And that last one was, like, he's just leaving or I'm

6    just getting done or something?

7    A.    I didn't look at the time, but if that's what it says,

8    it could have been that late.

9    Q.    Because Dr. Al went through each file that was given

10   to him, and I think part of that Jeff told you was page by

11   page?

12   A.    Correct.  That's what he said, uh-huh.

13   Q.    And did you get those files back?

14   A.    They were there in the office.  They never left the

15   office.

16   Q.    Was there anything, during that review, that you're

17   aware of where there was an indication that something --

18   after Jeff talked to him, because in the text message it

19   says:  I had to explain to him everything, I had to go

20   through the PMPs and explain my reasoning, explain my medical

21   diagnosis.  Any of those files get flagged for not to do that

22   again?

23   A.    Not that I'm aware of, no.

24   Q.    It wasn't really a gracious way to fire you, was it?

25   A.    Do what?

1   Q.   I said that wasn't a really gracious way to fire you.

2   Did he just fire you by text message?

3   A.   No.  He didn't fire me.  I quit.

4   Q.   That's right.  You quit.  And he told the people he

5   fired you.

6   A.   Correct.

7   Q.   Did he spit Vodka on you?

8   A.   He did.

9   Q.   And you testified he thought he was more qualified

10   than other doctors?

11   A.   Yes.

12   Q.   Did he think he was the smartest person in the room?

13   A.   Yes.

14   Q.   Did he think anyone could tell him how to practice

15   medicine?

16   A.   No.

17   Q.   Did he think the way he was practicing medicine was

18   the right way for him to practice medicine?

19   A.   That's what he believed, yes, sir.

20   Q.   Thank you.

21         MR. FERGUSON:  That's all I have, Judge.

22         THE COURT:  Thank you.

23         Any redirect?

24         MS. PAYERLE:  Yes, Your Honor.

25

1          REDIRECT EXAMINATION

2    BY MS. PAYERLE:

3      Q.   I think Mr. Ferguson just asked you if Mr. Young

4    believed that he was infallible?

5      A.   Correct.  Yes, ma'am.

6      Q.   And you said that in his own mind he believed he was?

7      A.   Correct.  Yes, ma'am.

8      Q.   Did -- when the medical board asked Mr. Young to see

9    his files, how he was treating these patients, did he just

10   hand them over as they were in his clinic?

11     A.   No, ma'am.

12     Q.   What did he do?

13     A.   He -- he went through the charts to make sure

14   documentation was done, and if it wasn't, he would do it.

15   And if the overseeing physician hadn't signed the chart, he

16   would stamp the name, the doctor's name.

17     Q.   Is it fair to say that Mr. Young understood that he

18   needed to cover up what he was actually doing when the

19   medical board came to investigate?

20          MR. FERGUSON:  I'm going to object to the form of

21   the question.

22          THE COURT:  Sustain.

23   BY MS. PAYERLE:

24     Q.   Did Mr. Young tell you why he was doing that?

25     A.   Because there was a correct way to do it and a wrong